**Electronically Filed
Intermediate Court of Appeals
CAAP-13-0000252
30-SEP-2014
09:13 AM**

CAAP-13-0000252 AND CAAP-13-0001096

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

CAAP-13-0000252

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
ALATAUA S. FANENE, Defendant-Appellant

AND

CAAP-13-0001096

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
MICHAEL K. SANCHEZ, also known as "Black",
Defendant-Appellant,
and
ALATAUA S. FANENE and SEAN D. WALLACE,
Defendants-Appellees

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 11-1-0356)

MEMORANDUM OPINION
(By: Nakamura, C.J., and Foley and Ginoza, JJ.)

Plaintiff-Appellee State of Hawai'i (State) charged
Defendants-Appellants Alataua S. Fanene (Fanene) and Michael K.
Sanchez (Sanchez), along with co-defendant Sean D. Wallace
(Wallace), in an eleven-count indictment.  The State alleged that
Fanene and Sanchez kidnapped the complaining witness (CW), beat
him, robbed him, and stole his van.  It also alleged that Wallace
was an accomplice to the kidnapping and robbery.

Fanene and Sanchez were both charged with attempted first-degree assault (Count 1); first-degree robbery (Count 2); kidnapping (Count 3); and unauthorized control of a propelled vehicle (UCPV) (Count 6 for Sanchez and Count 7 for Fanene). Fanene was additionally charged with four counts of carrying or use of a firearm in the commission of a separate felony (Counts 4, 5, 8, and 9). Wallace was charged with being an accomplice to first-degree robbery (Count 10) and being an accomplice to kidnapping (Count 11).

The indictment was returned on March 16, 2011. Wallace pleaded guilty pursuant to a cooperation agreement and testified for the State at trial. After numerous continuances, trial was set for the week of December 3, 2012. Fanene and Sanchez waived their right to a jury, and they agreed to a bench trial before the Circuit Court of the First Circuit (Circuit Court).[1] On the day before trial, Fanene made a request to substitute privately-retained counsel for his court-appointed counsel if the Circuit Court was willing to continue the trial. The Circuit Court denied the request for a trial continuance, and Fanene proceeded to trial with his appointed counsel.

At the close of the evidence, the Circuit Court found Fanene and Sanchez guilty as charged of attempted first-degree assault, kidnapping, and UCPV, and guilty of the included offense of second-degree robbery. The Circuit Court further found that the second-degree robbery count (Count 2) merged into the kidnapping count (Count 3), and it acquitted Fanene of the firearms offenses. The Circuit Court sentenced Fanene and Sanchez to imprisonment of ten years for attempted first-degree assault, twenty years for kidnapping, and five years for UCPV, all terms to run concurrently with each other and to any other sentence they were serving. The Circuit Court also imposed mandatory minimum terms of incarceration on Sanchez based on his status as a repeat offender. The Circuit Court entered its

---

[1] The Honorable Michael D. Wilson presided.

Judgment as to Fanene on February 26, 2013, and its Judgment as to Sanchez on April 11, 2013.

On appeal, Fanene and Sanchez argue that there was insufficient evidence to support their convictions for attempted first-degree assault. Fanene also contends that the Circuit Court abused its discretion in denying his motion to continue trial, "thereby in effect denying [Fanene] his choice of private counsel." (Capitalization altered.)[2] As explained below, we affirm the Circuit Court's Judgments.

BACKGROUND

I.

The CW moved to Hawai'i in 1986 and graduated from Waialua High School in 1996. In 2001, he became disabled after a car accident, and he collected disability benefits while living with his mother. After his mother died in 2005, the CW became homeless. In 2011, he purchased a Dodge van, modified the interior, and began living in the van. The CW kept all his belongings in the van, including a "BB gun" made of plastic and a "miniature bat" that was about two feet long and made of wood. As part of his daily routine, the CW would stay with other homeless people at Kaiaka Beach Park during the day until the park closed at 6:45 p.m., then drive his van to Hale'iwa Harbor. When the harbor closed at 10:00 p.m., the CW would drive his van and park it at Hale'iwa Beach Park at a place known as "Walls," which was an area where homeless people parked at night.

The CW testified that on March 5, 2011, at around 10:30 p.m., he was parked at "Walls." The CW saw Fanene and Sanchez being dropped off by a third person. The CW recognized Fanene because Fanene's mother, who was homeless like the CW and parked at "Walls" during the night, was the CW's friend and Fanene would come to visit his mother. Fanene and Sanchez approached the CW, and Fanene asked the CW if Fanene could buy drugs for $10. The

_____

[2] By order filed on May 7, 2014, the separate appeals filed by Fanene and Sanchez were consolidated for disposition.

CW sold Fanene $20 worth of "ice" for $10. Fanene and Sanchez asked if they could smoke the "ice" in the CW's van, and the CW agreed. After Fanene and Sanchez finished smoking, they asked the CW if he could drive them to meet their friend. The CW agreed, and he drove them and parked behind a car they identified as their friend's car.

As the CW turned to shake their hands and say goodbye, Fanene and Sanchez suddenly attacked. Fanene punched the CW in the mouth, and Fanene and Sanchez pulled the CW from the driver's seat to the back of the van. While the CW lay on his side, Fanene and Sanchez punched the CW and demanded drugs and money. Fanene and Sanchez continued to strike the CW with fists and a wooden bat, while demanding "[W]here's the shit?" "[W]here's the stuff?" and searching the CW's pockets. Sanchez used the wooden bat to "whack" the CW in the eye and the head, and the CW estimated that Fanene and Sanchez each struck him about ten times. The CW felt pain "just all on my head" and also on his body.

At some point, the CW was held face down in the back of his van, with Fanene putting his knee on the CW's back. Fanene and Sanchez pulled the CW's hands behind his back and bound them so the CW could not move his arms. They continued to strike the CW as they were tying him up. Fanene and Sanchez took about $400 and an eighth of an ounce of "ice" that the CW was keeping in his van.

After the CW's hands were bound, Fanene continued to hold the CW down in the back of the van while Sanchez drove the van away. Based on the conversation between Fanene and Sanchez, the CW believed they were looking for a place to "dump" him. The CW testified that he felt Fanene place a gun against the CW's head, pointed at his left temple. Fanene told the CW to "shut up, don't move," or he was going to "get it." Fanene advised the CW that Fanene was holding a gun and that it was "the real thing"

4

and "not like your little pellet gun." The CW was scared and thought he "was going [to] die."

The van stopped, and Fanene and Sanchez switched places, with Fanene driving. Eventually, the van stopped again. Fanene pulled the CW out of the van and walked him into some bushes. It was dark, "[l]ike pitch black[,]" with "[n]o lights around[,]" and the CW did not know where he was. The CW's "lip, . . . head and stuff" were bleeding, and he felt dizzy. The CW's hands remained tied behind his back. Fanene walked the CW to a "certain spot," pushed the CW down, hit him a "[c]ouple times" in the head, and warned the CW to stay there and not to come out. The CW lost consciousness.

The CW regained consciousness in the "middle of the day, probably early." He was in bushes and there was "all California grass" around him. The CW was fatigued and exhausted. His hands were still bound and he did not know where he was. The CW again lost consciousness. He recalled being dizzy, which he attributed to the loss of blood from bleeding "plenty." When the CW regained consciousness a second time, it appeared to be around noon time. About 36 hours had passed from the time the CW was first abducted until he regained consciousness the second time.

Upon regaining consciousness the second time, the CW kept moving his hands and was able to free himself. He was able to walk from the bushes where he had been dumped to a residence where he asked for water. A friend drove by and gave the CW a ride back to Kaiaka Beach Park. When the CW arrived at Kaiaka Beach Park, it was already 2:30 in the afternoon on March 7, 2011. At the park, the CW reported what had happened to him to the police. The police had been looking for the CW because Abel Abrojina (Abrojina), a friend of the CW, had reported him missing earlier that morning.

Abrojina testified that Fanene and another person were dropped off at "Walls" one evening. The next morning, Abrojina did not see the CW's van parked in its usual place. Abrojina began looking for the CW's van, and later that night, he located

the van parked near a gymnasium with no one around. Belongings that the CW normally kept in the van appeared to be missing, and the keys were still in the ignition. Abrojina drove the van to Hale'iwa Beach Park, and he notified a police officer that the CW was missing and that there was blood in the CW's van.

On March 7, 2011, at about 4:30 a.m., Honolulu Police Department (HPD) Officer Christopher Reid (Officer Reid) was informed by Abrojina that the CW was missing. Abrojina showed Officer Reid the CW's van. Officer Reid examined the CW's van and observed a "large amount of blood in the van[.]" Officer Reid testified, "it looked like somebody was bleeding heavily in the van because there was a big, almost still wet puddle of blood in the middle of the van on the rug."

II.

Pursuant to a cooperation agreement, Wallace testified for the State. Wallace testified that he spent the day on March 5, 2011, driving Fanene around and smoking "ice" and marijuana with him. During the evening, Wallace picked up Sanchez at Fanene's request, and all three of them smoked "ice" where Sanchez was staying. At about 10:30 p.m., Wallace dropped off Fanene and Sanchez at Hale'iwa Beach Park at a place called "Walls." Fanene told Wallace to drive up the road and wait, and Wallace did so because he expected to receive a "bag of weed" for driving Fanene around that day.

Later, Fanene, Sanchez, and the CW arrived in a Dodge van and parked fifteen to twenty feet behind Wallace's car. Wallace saw the van "shaking" and went to investigate. Through the partially opened passenger-side door, Wallace saw that Fanene was on top of the CW and that the CW was "getting beaten up." Wallace heard "a lot of yelling and screaming and shouting[,]" which sounded like the beating was painful. Wallace heard Fanene telling the CW to "Give me the shit." Fanene noticed that Wallace was there and demanded that Wallace "get back in [your] fuckin' car." Wallace was scared and complied with Fanene's demand.

Subsequently, Fanene and Sanchez drove the van away and told Wallace to follow them and that they were looking for a place to "dump this guy." Wallace followed the van until it stopped near a burned-down clubhouse at Poamoho Camp. Wallace saw Fanene and Sanchez get out of the van and open the sliding door, but from his vantage point could not see whether they took anything out. Wallace eventually saw Fanene and Sanchez return to the van. Wallace thought the CW was dead.

Wallace then followed the van until it stopped at the back of the Whitmore Village gym. Fanene and Sanchez removed things from the van and put them in Wallace's car. Wallace then drove the three of them away and they later divided the items taken from the van.

After the incident, both Fanene and Sanchez talked to Wallace about what they had done to the CW in the van. Fanene told Wallace that he had "stomped the guy" and showed Wallace blood on Fanene's pants. Sanchez told Wallace that it "felt good to hit [the CW]."

III.

The State called T.F., who was Fanene's girlfriend and the mother of his child. T.F. had provided the police with a recorded interview statement on March 10, 2011. In her recorded statement, T.F. told the police that when she found out that the police were looking for Fanene regarding an "attempted murder and that robbery[,]" she called him. T.F. stated that "[Fanene] told me he killed the guy, but he didn't do no robbery, he tried to kill the guy, but he left not knowing the guy wasn't dead." She told the police that Fanene said "[Fanene] attacked [the guy], tried to kill him" and that Fanene said he "wanted to kill the guy." T.F. stated that in a subsequent phone call, she told Fanene that the guy was not dead. T.F. stated that Fanene did not say anything in response, and she stated that "[h]e thought the guy was dead." T.F. also hand-wrote next to a picture of Fanene, "This is my boyfriend Alataua Fanene as know as taua, he's the one who told me he killed [the CW] 5 days ago. And I

7

also been dating taua for 6 months but I know him for 2 years." T.F. signed and dated this written statement.

At trial, T.F. recanted these statements that she had made to the police. T.F. testified at trial that Fanene "basically just told me that nothing happened" and she denied that Fanene had ever told her he had killed the guy or thought he had killed the guy. The State confronted T.F. with the prior inconsistent statements she had made to the police. However, T.F. testified that her statements to the police were lies, and that she had lied to the police because she was angry at Fanene and afraid of the police.

The State called HPD Officer Alan Oku (Officer Oku), who had obtained the recorded interview statement and the written statements from T.F. Officer Oku authenticated the transcript of the recorded statement (Exhibit 116) and T.F.'s written statement (Exhibit 117). The State then offered T.F.'s prior inconsistent statements as set forth in Exhibits 116 and 117 as substantive evidence under Hawaii Rules of Evidence (HRE) Rules 802.1 and 613(b) (1993). The Circuit Court admitted Exhibits 116 and 117 as prior inconsistent statements over the objection of Fanene and Sanchez.

IV.

The defense called Dr. Oakley Davis (Dr. Davis), the emergency room physician who treated the CW. Dr. Davis treated the CW at the Wahiawa General Hospital Emergency Room on March 7, 2011, after the CW had spoken to the police. Dr. Davis testified that his final diagnosis of the CW was "facial contusions and abrasions, scalp lacerations, and a closed head injury." Dr. Davis identified the injuries to the CW as "a 1.5-centimeter semicircular laceration to the left superior scalp[,]" "half-centimeter laceration to the right forehead at the hairline, contusion and abrasions to the lips, contusion to the left eye, and blood in the right external nares, basically in the nose, dry blood." In filling out a form provided by the police, Dr. Davis concluded that the CW's injuries amounted to

8

"substantial bodily injury" because the injury did "cause a major avulsion, laceration, or penetration of the skin[.]"  In this regard, Dr. Davis noted the CW's scalp laceration.  Dr. Davis concluded that the CW's injuries did not amount to "serious bodily injury" because they did not "create a substantial risk of death"; "cause any serious permanent disfigurement"; or cause "protracted loss or impairment of the function of any bodily member or organ[.]"  The CW was released from the hospital the same day he was treated by Dr. Davis.

Dr. Davis stated that based on the information he had been provided, at least 36 hours had elapsed between the time the CW's injuries were inflicted and the CW was treated at the hospital.  Dr. Davis noted that the CW reported that he had been assaulted on the night of March 5th and that he had managed to free himself on the morning of March 7th.  Dr. Davis explained that he decided not to suture the CW's wounds because: "you don't want to suture a wound that could be contaminated and get infected; you don't generally want to suture wounds at 36 hours; and based on their size, they were already closing on their own, so it was not necessary[.]"

Dr. Davis testified that there are potential dangers attendant to the loss of consciousness:

> If you're unconscious, there's a potential that you will be unable to breathe appropriately if you're in a position that blocks your airway with resulting loss of oxygen to the brain which can itself result in a brain injury.  Also some risk of aspirating, which means vomiting -- basically vomit or blood, for that matter, going into your airway also causing a loss of oxygen to the brain and subsequent damage.

Dr. Davis stated that the potential risks of an unconscious person's breathing being obstructed are increased if the unconscious person is (1) lying face down; (2) in heavy brush like the weeds along Kamehameha Highway in Hale'iwa; and (3) with his arms tied behind his back.  Dr. Davis noted that if someone is rendered unconscious for a prolonged period of time, brain damage due to hypoxia, or oxygen deficiency, is a potential danger.  Dr. Davis explained that there is a concern about a

person vomiting while unconscious because head injuries can cause vomiting and an unconscious person cannot clear their own airway.

Dr. Davis stated if a person were unconscious for "a day," it would present a risk of breathing problems, hypoxia, and the potential of aspiration of vomit. The risk of death would be increased if the person was unconscious for that time period face down with his hands tied behind his back in a heavily vegetated area. Dr. Davis also stated that a person's scalp is "very vascular" and that he would expect to see heavy bleeding from the lacerations the CW sustained to his scalp and forehead.

V.

At the conclusion of the bench trial, the Circuit Court found Fanene and Sanchez guilty of attempted first-degree assault, the included offense of second-degree robbery, kidnapping, and UCPV. The Circuit Court merged the second-degree robbery count into the kidnapping count. The Circuit Court made the following pertinent findings:

> After reviewing the relevant evidence, including the exhibits and the testimony offered in this case, the Court finds that on the evening of March 5th, 2011, Defendants Fanene and Sanchez did hold [the CW] against his will, subjecting him to beating within his van that continued intermittently until his release on the morning of March 6, 2011. The beating was done in concert by Mr. Fanene and Mr. Sanchez. It included repeated blows to the body and head of [the CW]. A small bat was used by Defendant Sanchez to strike [the CW] repeatedly in the head.
>
> The beating caused extensive bleeding, and I mean the beating inflicted by both Mr. Fanene and Mr. Sanchez. It did cause extensive bleeding from [the CW's] head. Notwithstanding the bleeding, both Mr. Fanene and Mr. Sanchez continued to beat [the CW] about the head and body.
>
> During the beating, [the CW] was threatened with death by Mr. Fanene with the knowledge of Mr. Sanchez. The threat included the threat to use a gun to kill [the CW].
>
> [The CW's] hands were tied behind his back by Defendant Fanene while he lay bleeding in his van. He was released by Mr. Fanene while bleeding with hands tied behind his back in a field near Poamoho Camp. Mr. Fanene struck [the CW] on the head after he was forced to lie in the field. [The CW] was bleeding from his head at the time.
>
> Mr. Fanene and Mr. Sanchez drove [the CW's] car without authorization. Over $400 in cash, electronic

equipment, and drugs belonging to [the CW] were taken from [the CW] without his consent by Mr. Fanene and Mr. Sanchez.

Dr. Oakley Davis' testimony established that [the CW] experienced lacerations and contusions to his eyes, lip, forehead, and scalp.

In finding Fanene and Sanchez guilty of attempted first-degree assault, the Circuit Court stated:

With respect to Count I, the Court finds that on or about the 5th day of March, 2011, to and including the 6th day of March, 2011, in the City and County of Honolulu, State of Hawaii, Alataua S. Fanene and Michael K. Sanchez did intentionally engage in conduct which is a substantial step in a course of conduct intended or known to cause serious bodily injury to [the CW], thereby committing the offense of attempted assault in the first degree in violation of Section 705-500 and 707-710 of the Hawaii Revised Statutes.

DISCUSSION

I.

A.

On appeal, both Fanene and Sanchez argue that there was insufficient evidence to support their convictions for attempted first-degree assault. We apply the following standard of review to such challenge:

In reviewing the sufficiency of the evidence on appeal, we view the evidence in the light most favorable to the prosecution. State v. Ildefonso, 72 Haw. 573, 576, 827 P.2d 648, 651 (1992).

The same standard applies whether the case was before a judge or a jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact. Indeed, even if it could be said in a bench trial that the conviction is against the weight of the evidence, as long as there is substantial evidence to support the requisite findings for conviction, the trial court will be affirmed.

"Substantial evidence" as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. And as trier of fact, the trial judge is free to make all reasonable and rational inferences under the facts in evidence, including circumstantial evidence.

State v. Hoe, 122 Hawai'i 347, 349, 226 P.3d 517, 519 (App. 2010) (block quote format altered; citation and brackets omitted).

11

Regarding proof of intent, "it is an elementary principle of law that intent may be proved by circumstantial evidence; that the element of intent can rarely be shown by direct evidence; and it may be shown by a reasonable inference arising from the circumstances surrounding the act." State v. Hopkins, 60 Haw. 540, 544, 592 P.2d 810, 812-13 (1979) (internal quotation marks, citation, and brackets omitted).

B.

The completed offense of first-degree assault requires that the defendant "intentionally or knowingly causes serious bodily injury to another person." Hawaii Revised Statutes (HRS) § 707-710 (1993). The term "serious bodily injury" is defined as follows:

> "Serious bodily injury" means bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

HRS § 707-700 (1993).

In this case, Fanene and Sanchez were not charged with the completed offense of first-degree assault, but rather with the offense of attempted first-degree assault. HRS § 705-500 (1993), which proscribes criminal attempts, provides in relevant part:

> (2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

> (3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

(Emphasis added.)

C.

Fanene and Sanchez assert that although the State established that the CW sustained substantial bodily injury, it

12

failed to prove that the CW sustained serious bodily injury.[3/] Fanene and Sanchez argue that because the State failed to adduce substantial evidence that the CW had suffered serious bodily injury, the Circuit Court erred in concluding that they were guilty of attempted first-degree assault.

This argument misses the mark. Proof of serious bodily injury is only necessary to establish the completed offense of first-degree assault. Fanene and Sanchez, however, were charged with attempted first-degree assault, which does not require proof that they actually caused serious bodily injury, but rather that they "intentionally engage[d] in conduct which [was] a substantial step in a course of conduct intended or known to cause" serious bodily injury. See HRS §§ 705-500, 707-710. In other words, for an attempted first-degree assault, the focus is not on the injury the defendant actually causes, but on the injury which the defendant intended to cause. Accordingly, the State could establish the charged first-degree assault through proof that Fanene and Sanchez intentionally took a substantial step in a course of conduct intended to cause serious bodily injury.

When viewed in the light most favorable to the State, we conclude that there was sufficient evidence to

---

[3/] A person commits the offense of second-degree assault by, among other means, "intentionally or knowingly causing substantial bodily injury to another[.]" HRS § 707-711(a) (1993). The term "substantial bodily injury" is defined as follows:

"Substantial bodily injury" means bodily injury which causes:

(1) A major avulsion, laceration, or penetration of the skin;

(2) A burn of at least second degree severity;

(3) A bone fracture;

(4) A serious concussion; or

(5) A tearing, rupture, or corrosive damage to the esophagus, viscera, or other internal organs.

HRS § 707-700 (Supp. 2013).

13

support the Circuit Court's finding that Fanene and Sanchez were guilty of attempted first-degree assault. The evidence showed that Fanene and Sanchez, acting in concert, beat the CW with their fists and a wooden bat, repeatedly striking him in the head, and causing the extensive loss of blood. Officer Reid's testimony that "there was a big, almost still wet puddle of blood in the middle of the van on the rug" more than 24 hours after the assault shows that the CW had been bleeding heavily. Fanene and Sanchez tied the CW's hands behind his back and took him to a heavily vegetated area, where Fanene pushed the CW down and delivered more blows to the CW's head. The CW lost consciousness and, while regaining consciousness once, appears to have been unconscious for at least twenty-four hours. Before Fanene learned that the CW was still alive, Fanene told his girlfriend that he killed the CW. Fanene also told his girlfriend that he tried and wanted to kill the CW, and that he had left the CW "not knowing [the CW] wasn't dead."

In addition, Dr. Davis, the emergency room doctor who treated the CW, testified that the CW had suffered lacerations and contusions to his eyes, lip, forehead, and scalp, and that the CW's head wounds would cause extensive bleeding. Dr. Davis opined that if a person was rendered unconscious for "a day," it would present a risk of breathing problems, hypoxia, and the potential of aspiration of vomit. Dr. Davis further opined that the circumstances indicated by the evidence in this case -- a person rendered unconscious for a prolonged period of time, lying face down, in heavy vegetation, with his hands tied behind his back -- created an increased risk of death.

Based on the evidence presented, the Circuit Court could reasonably find that Fanene and Sanchez intentionally took a substantial step in a course of conduct intended to "create[] a substantial risk of death" or cause "protracted loss or impairment of the function of any bodily member or organ." HRS § 707-700 (1993). Viewed in the strongest light for the government, we conclude that there was substantial evidence that

14

Fanene and Sanchez intentionally engaged in conduct which was a substantial step in a course of conduct intended to cause serious bodily injury. Accordingly, we affirm their convictions for attempted first-degree assault.

II.

Fanene argues that the Circuit Court abused its discretion in denying his motion to continue trial, and thereby effectively denied Fanene his right to privately retained counsel of his choice. We disagree.

A.

The pertinent facts underlying this issue are as follows. The indictment was filed on March 16, 2011. Fanene was arraigned on March 21, 2011, and trial was originally set for the week of May 30, 2011. Based on requests by Wallace and the State, the trial was continued several times, over Fanene's objection, which resulted in trial being rescheduled for June 2012. On June 26, 2012, both Fanene and the State stipulated to continue the trial, and the Circuit Court rescheduled the trial for the week of October 15, 2012. On September 25, 2012, the State declared that it was ready for trial, but Fanene and Sanchez moved for a trial continuance because they wanted more time to prepare and review discovery. The State objected to the requested continuance, and the Circuit Court denied the motion. On October 2, 2012, a status conference was held which resulted in the trial week being continued and a "firm trial" setting for the week of December 3, 2012. During November 2012, several chambers conferences were held. The minutes for these conferences indicate that the trial was expected to last six days and that negotiations for Fanene and Sanchez to change their pleas were taking place. The minutes for a November 27, 2012, chambers conference indicate that a change of plea hearing was set for November 30, 2012, but that the State requested that its witnesses be ordered to appear for trial if Fanene and Sanchez did not change their pleas.

At the hearing on November 30, 2012, Fanene and Sanchez did not change their pleas, but they waived their right to a jury trial. At this hearing, the Circuit Court, at the State's request, ordered T.F., Fanene's girlfriend, to appear on December 5, 2012, for trial. At a hearing held on December 3, 2012, the Circuit Court, at the State's request, ordered Abrojina to appear for trial on December 5, 2012, and stated that it would issue a bench warrant if Abrojina did not appear.[4]

The minutes for a chambers conference held on December 4, 2012, reflect that Michael Green, Esq. (Green) informed the Circuit Court that he would take Fanene's case if the Circuit Court was willing to continue the trial. The Circuit Court noted that it would not continue the trial and that the jury waived trial would commence the next day.

On December 5, 2012, the parties appeared for the beginning of the bench trial. Prior to the State calling its first witness, the following exchange took place:

> MR. GOO [(Fanene's appointed counsel)]: If I may, Your Honor, on Monday I was informed that my client was in the process of retaining attorney Michael Green on a private basis. I am court-appointed in this case, Your Honor. And that's when I informed the attorneys and the Court and so a status conference was scheduled yesterday, Tuesday, December 3rd. And of course today -- I'm sorry, that would be December -- Monday is December 3rd, yesterday -- well, Tuesday, on the 4th is when we had our status conference and of course trial is starting today, December 5th.
>
> At the status conference Mr. Green did appear. He did state that a check in a sufficient amount was tendered to him and he requested that he be allowed to be attorney of record, withdrawal and substitution of counsel, but he would be asking for a continuance because of the fact that he needed to have time to prepare. There's over a thousand pages of discovery and so on and so forth.
>
> And, Your Honor, my client, you know, does desire to retain Mr. Green. And so -- so that is the -- the request from my client that this case be continued so that his -- so that a private attorney can come aboard who's willing and able to do so but at some future point.

---

[4] At trial, Abrojina testified that he was a friend of both the CW and Fanene, and that he had been in a relationship with Fanene's mother.

THE COURT: Mr. Bell [(the Deputy Prosecuting Attorney)]?

MR. BELL: Ask the Court to take judicial notice of the records and files and the procedural history of this case. At that status conference, the prosecution took no position with regards to the potential withdrawal and substitution but did make clear its position that the trial should go on as scheduled. Motions to continue are committed to the discretion of the trial court and the trial court made its ruling. My recollection is that there would be no opposition to Mr. Green entering the case with the understanding that we were beginning today, December 5, as scheduled. And thereafter Mr. Green elected not to continue.

THE COURT: And your position regarding the request to continue, Mr. Bell?

MR. BELL: The State objects, the State is ready to proceed. Thank you.

THE COURT: Yes. Given the nature of this case, it's been subject to a number of continuances and the efforts that have been made by the parties to prepare, the request of Mr. Green at this time, the day before trial, to continue the trial will be denied. And to find that it would potentially interfere with the preparation of the State's case, State having witnesses some of whom are homeless, that it has been making a great effort to subpoena and to gain the appearance of the Court (sic).

And the request of Mr. Green to enter the case as counsel for Mr. Fanene, certainly a request that is agreeable as long as Mr. Green was prepared to enter the case and proceed to trial. But, understandably, given the timing of the case where Mr. Green was just retained yesterday, he's not able to prepare. And, accordingly, we will proceed with the trial today and his request to continue is denied.

### B.

We review a trial court's decision on a motion for continuance under the abuse of discretion standard. "[A] motion for continuance is addressed to the sound discretion of the trial court, and the court's ruling will not be disturbed on appeal absent a showing of abuse of that discretion." State v. Cramer, 129 Hawai'i 296, 300, 299 P.3d 756, 760 (2013) (internal quotation marks and citation omitted).

With regard to a criminal defendant's request for substitution of counsel,

the right to counsel of choice is qualified, and can be outweighed by countervailing governmental interests. But in

17

> light of the right to counsel, and in the absence of
> countervailing considerations, a criminal defendant should
> have his, her, or its choice of privately retained counsel.
> Whether a change in counsel should be permitted rests in the
> sound discretion of the trial court.

Id. (block quote format altered; citation and ellipsis points
omitted).

Under Article I, section 14 of the Hawai'i
Constitution, a criminal defendant has a constitutional right to
privately retained counsel of his or her choice. Id. at 300-01,
299 P.3d at 760-61. This right, however, "is qualified, and can
be outweighed by countervailing government interests." Id. at
300, 299 P.3d at 760 (block quote format altered; citation
omitted). In Cramer, the Hawai'i Supreme Court identified the
following factors that can be relevant in examining the
countervailing government interests that should be balanced
against the right to counsel of choice:

> (1) length of the continuance; (2) whether there was a
> dilatory motive for the continuance; (3) whether the
> prosecution knew of the motions beforehand and whether the
> prosecution objected; (4) whether the delay would have
> inconvenienced the prosecution or its witnesses; (5) whether
> current court-appointed counsel was prepared to proceed; (6)
> whether the defendant had already retained private counsel;
> and (7) whether the continuance would interfere with the
> efficient administration of justice[].

Id. (citing People v. Butcher, 79 Cal. Rptr. 618, 621 (1969)).

C.

Fanene's principal argument is that because the Circuit
Court had, at the beginning of the case, granted lengthy requests
for continuances made by the State and Wallace, the Circuit Court
abused its discretion in denying Fanene's request for a
continuance to permit the substitution of Green as retained
counsel. We are not persuaded. For the reasons discussed below,
we cannot say that the Circuit Court abused its discretion in
denying Fanene's request for a continuance to permit substitution
of retained counsel, which was made on the eve of trial.

As this court has previously observed:

> [C]ourts generally 'view with disfavor requests for a
> continuance made on the day set for trial or very shortly

18

before.' . . .

> An attorney cannot reasonably expect a court to alter
> its calendar, and disrupt a scheduled trial to which
> witnesses have been subpoenaed and to which the
> adverse party is ready, simply by the filing by
> counsel of a last minute motion for continuance. All
> weight of authority is contrary to such wishful
> speculations.

State v. Lee, 9 Haw. App. 600, 603-04, 856 P.2d 1279, 1281-82 (1993) (citations omitted). The State had declared itself ready for trial on September 25, 2012, and on October 2, 2012, the Circuit Court, two months in advance of trial, firm set the trial date for the week of December 3, 2012. The indictment had been pending for almost two years, and Fanene offered no explanation for why he waited until the day before trial to seek the substitution of Green. In stating his request for a continuance on the record, Fanene did not specify the length of the continuance he sought, but suggested that the delay would be long in referring to the over one thousand pages of discovery that Green would have to review.

There is no indication that the State was aware of Fanene's plan to seek substitution of counsel beforehand, and the State objected to the continuance of the trial, but it did not object to the substitution of counsel as long as no continuance was required. The Circuit Court found that a continuance would potentially interfere with the State's ability to prepare its case, noting that some of the State's witnesses were homeless and that the State had been making a great effort to subpoena its witnesses. The Circuit Court's finding was supported by the fact that it had previously ordered, at the State's request, two of the State's witnesses to appear for trial and that the State actually called fourteen witnesses on the first day of trial.

Fanene does not challenge the preparation of his court-appointed counsel or the ability of his court-appointed counsel to try the case as scheduled. The record suggests that Fanene had not fully retained Green, as Green informed the Circuit Court that he would take Fanene's case if the Circuit Court granted a

19

continuance. The Circuit Court's findings also reveal that it believed a continuance would interfere with the efficient administration of justice. Under the circumstances of this case, we conclude that the Circuit Court did not abuse its discretion, or violate Fanene's right to privately retained counsel of his choice, in denying Fanene's belated request to continue the trial.

CONCLUSION

We affirm the Circuit Court's February 26, 2013, Judgment with respect to Fanene and its April 11, 2013, Judgment with respect to Sanchez.

DATED: Honolulu, Hawaiʻi, September 30, 2014.

On the briefs:

Nelson W.S. Goo
for Defendant-Appellant
Alataua S. Fanene

Arthur Indiola
for Defendant-Appellant
Michael K. Sanchez

Brandon H. Ito
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

*Craig H. Nakamura*
Chief Judge

Associate Judge

Associate Judge